**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KIRKSEY,

                        **Petitioner,**

           *- against -*

GRIFFIN,

                       **Respondent.**

**14 Civ. 8265 (NSR)(LMS)**

**REPORT AND**
**RECOMMENDATION**

**TO: THE HONORABLE NELSON ROMAN, U.S.D.J.**[1]

     On October 15, 2014, Petitioner Alphonso Kirksey ("Petitioner"), filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his 2009 judgment of conviction for Attempted Murder in the First Degree, Attempted Murder in the Second Degree, Assault in the First Degree, Attempted Aggravated Assault on a Police Officer, Criminal Possession of a Weapon in the Second Degree, and Criminal Possession of a Weapon in the Third Degree, and his aggregate term of imprisonment of from twenty-five years to life and five years of post-release supervision (PRS). ECF 1; ECF 17, Ex. 13: Sentencing Transcript. On April 8, 2015, Petitioner filed an amended petition ("Petition"), in which he asserts the following claims: (1) counsel was ineffective in failing to "establish an intoxication defense[,]" (2) counsel was ineffective in failing to assert a double jeopardy defense, (3) counsel's "ineffectiveness rose to the level of a complete denial of counsel[,]" (4) the "quantity of the errors as a whole and their cumulative effect deprived petitioner of a fair trial," (5) "Petitioner was deprived of a fair trial because he was forced to participate in the trial dressed in prison clothes[,]" (6) Petitioner was

---

[1] On December 1, 2014, Petitioner's application was referred to the undersigned by the Honorable Nelson Román. ECF 5.

deprived of a fair trial by the trial judge's "fail[ure] to recuse himself after exhibiting bias toward petitioner[,]" (7) the "assault counts relative to Officer Eltz and Connie Sackett should have been separated... for purpose of trial[,]" (8) the trial court erred by permitting the introduction of evidence of a prior altercation between Petitioner and Sackett, (9) the court erred in precluding Sackett's post-incident letters to Petitioner, and (10) Petitioner's conviction was against the weight of the evidence and was not supported by legally sufficient evidence.[2] ECF 18, pp. 3-4.

For the following reasons, I conclude, and respectfully recommend that Your Honor should conclude, that this Petition should be dismissed in its entirety.

## BACKGROUND

In 2005, Connie Sackett lived in an apartment in Newburgh, New York, along with Petitioner, her sister, her sister's husband, and her sister's three young children. ECF 17, Ex. 5, pp. 297-98. In February of 2005, Sackett trimmed her hair. When she arrived home she engaged in an altercation with Petitioner, who choked her and told her that he had the privilege of deciding whether she could cut her hair. After the argument, Sackett went to live with her mother for a few days. When she returned to her apartment, Petitioner was no longer living there. Petitioner moved back into the apartment three or four days prior to March 11, 2005. *Id.* at 300-04.

---

[2] The claims raised in Petitioner's initial habeas petition, as well as those raised in his amended Petition, are presented in bullet-point format. Petitioner's initial petition does not contain any accompanying argument or memorandum of law, and the "argument" section of his amended Petition only addresses Petitioner's claim that counsel should have called an expert witness with respect to his intoxication defense. Because Petitioner's claims generally track the claims which he had raised in his counseled and *pro se* briefs to the Appellate Division, the Court presumes that Petitioner intended to assert the arguments which he raised in state court in support of his instant claims.

In the afternoon of March 10, 2005, Sackett was home with Petitioner. Petitioner informed her that he had found a receipt for lingerie in her table drawer. They engaged in an argument because Petitioner believed that Sackett had purchased the lingerie "for somebody else" and that she was cheating on him. Petitioner left the apartment. Sackett then put her nieces to sleep and fell asleep on the couch. *Id.* at 304-06. At approximately 12:30 AM on March 11, 2005, Petitioner returned to the apartment, woke Sackett, and said "let's go to bed." Sackett knew that Petitioner had been drinking and they began to argue in Sackett's bedroom about Petitioner's drinking and about Petitioner's belief that Sackett had been cheating on him. Petitioner was speaking clearly and was not falling or stumbling. *Id.* at 304-08. Sackett told Petitioner that she was "fed up with him" and started walking toward the door. Petitioner went into the closet and, as Sackett placed her hand on the door handle, she heard what sounded like a "whole bunch of [what] sounded like firecrackers going off at once." Sackett's left arm went completely numb and the next thing she remembered was that she was on the floor. *Id.* at 309-13. Petitioner lifted Sackett's head up and said, "I'm sorry, I'm sorry." Petitioner was crying. Sackett responded, "get the F out of here." *Id.* at 314.

Marshall Robinson, Sackett's downstairs neighbor, heard the argument between Sackett and Petitioner. Robinson heard gunshots and Petitioner say "if I can't have you, nobody can fucking have you" and "see what you made me do?" *Id.* at 276-83.

Sackett's sister, Nikita Henriquez, heard Sackett yelling for help and went to Sackett's bedroom room. She saw Sackett lying on the floor. Both Sackett and Petitioner were yelling at her to call the police. Petitioner kept saying that he was sorry, that he loved Sackett, and that he "didn't mean to do it." When Henriquez called the police, Petitioner ran out of the house. ECF 17, Ex. 5, pp. 266-75.

Officer Robert Vasta responded to Sackett's apartment and observed Sackett lying on the floor with holes in her arms and upper torso. Sackett said that her boyfriend had shot her and gave the officer a description of Petitioner's clothing. ECF 17, Ex. 5, pp. 254-56. Sackett was treated at Westchester Medical Center for gunshot wounds to her back, left forearm, left arm, and right shoulder. ECF 17, Ex. 8, pp. 543-50.

Shortly after 2:00 AM, Officer Erik Eltz received a radio transmission that Sackett had been shot and that the suspect was her boyfriend - a black male wearing a black jacket. He began to drive around the area to look for the suspect. Shortly thereafter he made contact with Petitioner. Officer Eltz exited his vehicle and instructed Petitioner to get down on the ground and to show his hands. Petitioner continued to walk away from Officer Eltz and said, "I don't know what you're talking about, I didn't do anything, I didn't do anything." Officer Eltz repeated his instruction and Petitioner said, "Okay, Okay." Petitioner then acted as if he was getting down on the ground. When Petitioner was approximately three feet from the ground, he removed a black object from his waistband and pointed it directly at Officer Eltz. Officer Eltz saw a muzzle flash, got down on the ground, fired four shots from his gun, and then made a call on his radio that shots had been fired. Officer Eltz pursued Petitioner into a cul de sac and then took cover behind a tree to await backup, which arrived in seconds. *Id.* at 386-400.

Sgt. Daniel Valeri, a K-9 officer, responded to assist in the search for Petitioner. He deployed his K-9 unit and the dog detected a human odor in the rear yard of a residence. Officers located Petitioner in a window well. Sgt. Valeri ordered Petitioner to exit the window well. ECF 17, Ex. 5, pp. 34-45, 285-90, 339-440, 438. When Petitioner exited the window well, Officer Kevin Lahar tackled him to the ground. Officer Nicholas Cardinale located a handful of

handgun rounds in Petitioner's jacket pocket. The officers observed a black revolver next to Petitioner. ECF 17, Ex. 5, pp. 34-45, 285-90, 438.

Officer Lahar transported Petitioner back to the precinct. When they were in the car, Petitioner stated: "I'm sorry. I fucked up. I did it because of love. I'm fucked up. I'm all fucked up. I ain't got nothing any more. Can I talk to the cop I shot? Can I please speak to the officer I shot the fires at [*sic*]. I want to say I'm sorry." When they returned to the police precinct at approximately 3:00 AM, Petitioner stated: "Why did I do that? I can't believe I did that. This can't be right. Why weren't my prayers answered? Why did I do that to her? She was all I had." ECF 17, Ex. 7, p. 441.

At approximately 4:00 AM, Detective Jason Albrechtsen met with Petitioner in an interview room and read Petitioner the *Miranda* warnings. Petitioner waived his *Miranda* rights and offered both an oral and written statement. Petitioner's answers were logically responsive to Det. Albrechtsen's questions and Det. Albrechtsen was able to understand Petitioner perfectly. Petitioner's oral and written statements reflected the same basic assertions: Petitioner had smoked marijuana and had been getting intoxicated before he arrived home on March 11, 2005. He got into an argument with his girlfriend at approximately 2:05 AM about lingerie that she had purchased. During the argument, she said "fuck you, you might as well leave." Petitioner then "went a little crazy" and "just snapped." Sackett was his "world and she wanted to throw [him] out." Petitioner grabbed a gun from the closet and began shooting at the wall. Sacket began to run away but she ran directly into the bullets he was firing. When Petitioner realized she was hit, he panicked. Petitioner told her he was sorry and tried to call 911. Sackett told him to go because "they're coming." Petitioner ran away and was stopped by the police. A police officer told him to freeze and Petitioner responded, "why me, why me." Petitioner then shot into the air

and kept running. Petitioner dropped the gun, hid in a window well, and prayed. ECF 17, Ex. 7, p. 444, 554-91.

Petitioner testified in his defense as follows: In February of 2005, Petitioner and his girlfriend, Connie Sackett, engaged in an argument about the fact that she had cut her hair. During the argument, Petitioner grabbed her hair and she hit him. Petitioner also pushed Sackett, and his hand may have gone up to her neck. During this time period, Petitioner and Sackett also argued about the fact that Petitioner had started drinking more heavily, which was causing problems in their relationship. ECF 17, Ex. 8, pp. 628-32.

On the morning of March 10, 2005, Petitioner and Sackett were on "eggshells" because of their prior argument involving Sackett's haircut, and because Petitioner noticed lingerie receipts. Petitioner left the apartment he was sharing with Sackett in the early afternoon of March 10, 2005, and went to a friend's house. Throughout that afternoon, Petitioner drank alcohol, smoked marijuana, and used cocaine. At some point he began seeing double vision and could not recall how he got home. ECF 17, Ex. 8, pp. 635-39.

When Petitioner arrived home, he and Sackett argued in their bedroom but Petitioner could not recall what they argued about. Sackett told him to "get out" so Petitioner began packing his bags, at which time he retrieved a gun he had inherited from his father. Petitioner retrieved the gun because he was going out "at a late time at night in New York." Petitioner then began shooting the gun inside the house and "she got hit." Petitioner went over to Sackett because "[he] was real hurt by it." Sackett asked Petitioner to call an ambulance. Petitioner tried to call an ambulance but he "couldn't see because he had tears in his eyes." Petitioner rubbed Sackett's hair and said that he was sorry. Petitioner then handed Sackett the gun and told her to

shoot him. Sackett cried and told him to "just go." Petitioner then left the house. ECF 17, Ex. 8, p. 633; ECF 17, Ex. 9, pp. 640-44.

After Petitioner left the house, he heard a car pull up next to him and a police officer told him to "freeze" and to "get on the floor." Petitioner "stumbled back, and the gun went off." Petitioner then ran away. Petitioner next recalled that he was "in the...little thing, that they found me in." Police officers began screaming "show me your hands" and the next thing Petitioner recalls there were "a lot of bodies and knees and everything else on top of [him]." Petitioner also recalls that he urinated on himself but he could not recall if it was because of the weight that was on top of him or because of his drinking. ECF 17, Ex. 9, pp. 644-47.

## PROCEDURAL HISTORY

On September 9, 2009, Petitioner was convicted, after a jury trial, of Attempted Murder in the First Degree, Attempted Murder in the Second Degree, Assault in the First Degree, Attempted Aggravated Assault on a Police Officer, Criminal Possession of a Weapon in the Second Degree, and Criminal Possession of a Weapon in the Third Degree.[3] ECF 17, Ex. 12, p. 914. On October 7, 2009, Petitioner was sentenced to an aggregate term of imprisonment of twenty-five years to life, to be followed by five years of PRS. ECF 17, Ex. 13.

On November 14, 2011, Petitioner, represented by counsel, filed an appeal in the New York State Appellate Division, Second Department, in which he raised the following claims: (1) the trial court erred in not "splitting the trials" between the events related to the attack on Officer Eltz, and those related to the attack on Sackett, (2) the trial court erred in not permitting the defense to utilize letters Sackett wrote to Petitioner after the shooting in which she stated that Petitioner "did not mean to hurt her[,]" (3) the trial court erred in permitting the prosecution to

---

[3] Petitioner was acquitted of a separate count of Criminal Possession of a Weapon in the Third Degree.

refer to an altercation between Petitioner and Sackett which took place approximately one month before the incident, (4) the evidence of Petitioner's guilt was legally insufficient and his conviction was against the weight of the evidence, (5) the assault convictions "should be dismissed as inclusory concurrent counts of the respective attempted murder counts[,]" (6) Petitioner was deprived of due process because his sentence was excessive and the sentence should be reduced in the interest of justice, (7) the cumulative effect of the "above" errors deprived Petitioner of a fair trial. ECF 16, Ex. 2, p. 77-122. Petitioner also submitted a *pro se* supplemental brief to the Appellate Division, Second Department, in which he asserted that his trial counsel was ineffective in failing to (1) "grasp the seriousness of [Petitioner's] crime," (2) fully develop the defense of intoxication by not calling witnesses, (3) object to the government's introduction at trial of prior uncharged crimes, and (4) object to improper jury instructions. ECF 16, Ex. 3, pp. 195-203. Petitioner further asserted that (1) the fact that he was required to wear prison-issued clothing during his trial caused the jury to infer that he was guilty, (2) the trial court erred in failing to recuse itself, (3) he was deprived of access to his attorney because he was not held at a county jail, (4) counsel lacked familiarity with the case, (5) counsel failed to properly examine Petitioner and other witnesses, and (5) counsel failed to investigate the case. *Id.* at pp. 203-07.

On June 12, 2013, the Appellate Division affirmed Petitioner's judgment of conviction. *See People v. Kirksey,* 107 A.D.3d 825 (2d Dept. 2013). The Appellate Division held as follows: (1) the trial court properly denied Petitioner's "motion to sever certain counts of the indictment, since the nature of the proof for each of the offenses was material and admissible as evidence upon the trial of the other counts in the indictment" and that "[i]nasmuch as the offenses were properly joined in one indictment from the outset, the court lacked the statutory authority to

sever them," (2) Petitioner's legal sufficiency claim was unpreserved, (3) the verdict was not against the weight of the evidence, (4) Petitioner's claim regarding the admissibility of prior uncharged crimes was unpreserved for appellate review, (5) Petitioner "was not deprived of the effective assistance of counsel," and (6) Petitioner's "remaining contentions, including those raised in his pro se supplemental brief, are without merit." *Id.*

In a letter dated June 13, 2013, Petitioner, through counsel, sought leave to appeal to the New York State Court of Appeals with respect to "*each and every contention raised in his brief on the direct appeal….*" ECF 16, Ex. 3, p. 244 (emphasis in original). The letter explicitly referenced, and was accompanied by, Petitioner's "main brief" and the government's responding brief. *Id.* On June 26, 2013, at the request of the New York State Court of Appeals, Petitioner's counsel provided the court with copies of Petitioner's *pro se* appellate brief, and the government's brief in opposition. ECF 39, Ex. 1. On October 7, 2013, an Associate Justice of the New York State Court of Appeals denied Petitioner's leave application. *Id.* at p. 241.

On October 6, 2014, Petitioner filed a federal petition for a writ of habeas corpus, in which he essentially raised the same claims which he had raised in his main and supplemental briefs to the Appellate Division. ECF 1. On January 29, 2015, Petitioner sought a stay of his habeas petition in order to submit a state court motion to vacate his judgment of conviction pursuant to New York Criminal Procedure Law (NYCPL) § 440.10. ECF 8. In his application and a series of follow-up letters, Petitioner asserted that (1) Petitioner had "failed to exhaust his significant claim of intoxication under the ground of Ineffective Assistance of Trial counsel" (ECF 8), (2) Petitioner "seeks to vacate the judgment of conviction on the basis of the stricture of Double Jeopardy" (ECF 8), (3) counsel failed "to raise the stricture of double jeopardy" (ECF

11), and (4) counsel failed to preserve the claim that the trial court erred in allowing the introduction of evidence of prior uncharged crimes (ECF 11).

In opposing Petitioner's motion, the government argued that "a cursory review of Petitioner's application suggests that" his proposed claims do not relate back to his initial petition and, therefore, the claims are untimely. ECF 10. By a Decision and Order issued on March 13, 2015, I observed that all of the claims in the initial petition "were exhausted in state court" on the grounds that Petitioner had raised the claims in the Appellate Division and the New York State Court of Appeals had denied his leave application. ECF 14, at p. 7. Accordingly, I denied Petitioner's motion for a stay, and liberally construed the motion as a motion to amend the petition to add new claims. *Id.* I granted Petitioner's request to amend his petition to include the claim of ineffective assistance based on counsel's failure to establish an intoxication defense, on the ground that Petitioner had already raised the claim in his initial petition. *Id.* at 7-8. I denied Petitioner's request to add the claim that counsel was ineffective in failing to interpose a double jeopardy defense on the ground that this claim did not relate back to any of the claims in the petition and, therefore, was time barred. *Id.* at 9. Similarly, I denied Petitioner's motion to amend his petition to assert that counsel was ineffective in failing to preserve the claim that the trial court erred in allowing the introduction of evidence of prior uncharged crimes on the ground that it would be futile to add the claim to the petition. *Id.* The basis for this finding was that such a claim could not be raised by way of a NYCPL § 440.10 motion, and there was no procedural mechanism pursuant to which Petitioner could raise this claim on direct appeal. *Id.* Accordingly, the claim would be deemed exhausted and procedurally defaulted. *Id.*

On April 8, 2015, Petitioner filed an amended Petition. ECF 18. The claims in the Petition generally mirror those raised in Petitioner's counseled and *pro se* briefs to the Appellate

Division. The exceptions are that the Petitioner omits his claims that his sentence was excessive, that counsel failed to object to a particular jury instruction, that the assault convictions should be dismissed as inclusory counts of attempted murder, and that he was deprived of access to his attorney because he was held at a county jail. Petitioner also adds two new claims to his amended Petition: (1) counsel was ineffective in failing to assert a double jeopardy defense, and (2) counsel should have called an expert witness in support of Petitioner's intoxication defense. On March 18, 2015, and July 24, 2015, Respondent opposed the Petition. ECF 16-17, 20.[4] On February 16, 2016, Petitioner submitted a reply. ECF 38.

## DISCUSSION

### I.     Applicable Law

"Habeas review is an extraordinary remedy." *Bousley v. United States*, 523 U.S. 614, 621 (1998) (citing *Reed v. Farley*, 512 U.S. 339, 354 (1994)). To be granted a writ of habeas corpus from a federal district court, a petitioner must fully and carefully comply with the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.

Before a federal district court may review the merits of a state criminal judgment in a habeas corpus action, the court must first determine whether the petitioner has complied with the procedural requirements set forth in 28 U.S.C. §§ 2244 and 2254. If a petitioner has met these threshold requirements, a federal district court generally may hear an application for a writ of habeas corpus on behalf of a person in custody pursuant to a state court judgment "only on the ground that [petitioner] is in custody in violation of the Constitution or laws or treaties of the

---

[4] On March 18, 2015, Respondent opposed the initial petition. On July 24, 2015, Respondent opposed the amended Petition by addressing the new claim raised in the amended Petition. Respondent's July 24, 2015, response incorporated the arguments made in Respondent's initial March 18, 2015, response. Accordingly, taken together, Respondent's March 18, 2015, and July 24, 2015, responses constitute Respondent's opposition to Petitioner's amended Petition.

United States." 28 U.S.C. § 2254(a). The court must then determine the appropriate standard of review applicable to the petitioner's claim(s) in accordance with § 2254(d).

Under the AEDPA, all state remedies must be exhausted before a federal court may consider a state prisoner's petition for a writ of habeas corpus. 28 U.S.C. § 2254(b)(1)(A); *see also Picard v. Connor*, 404 U.S. 270, 275 (1971). In the interests of comity and expeditious federal review, "[s]tates should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." *Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *see also Daye v. Attorney Gen. of the State of New York*, 696 F.2d 186, 190-91 (2d Cir. 1982). The exhaustion requirement of the federal habeas corpus statute is set forth in 28 U.S.C. § 2254(b)(1), (c):

> (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
> > (A) the applicant has exhausted the remedies available in the courts of the State; or
> > (B) (i) there is an absence of available State corrective process; or
> > > (ii) circumstances exist that render such process ineffective to protect the rights of the applicant. . . .
> (c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he [or she] has the right under the law of the State to raise, by any available procedure, the question presented.

28 U.S.C. § 2254(b)(1), (c).

The Second Circuit has adopted a two-stage inquiry to determine whether the exhaustion doctrine has been satisfied. *See Klein v. Harris*, 667 F.2d 274, 282 (2d Cir. 1981). First, the petitioner must have "fairly presented" his or her federal constitutional claim to the appropriate state courts. *Picard*, 404 U.S. at 275-76. "A claim has been 'fairly presented' if the state courts are apprised of 'both the factual and the legal premises of the claim [the petitioner] asserts in federal court.' " *Jones v. Vacco*, 126 F.3d 408, 413 (2d Cir. 1997) (quoting *Daye*, 696 F.2d at

191). In other words, the claim must have been presented in a way that is "likely to alert the court to [its] federal nature." *Daye*, 696 F.2d at 192. A claim that has not been "fairly presented" in state court is procedurally defaulted and is precluded from federal habeas review, unless Petitioner can show cause for the default, and prejudice resulting from the alleged violation of federal law, or that a fundamental miscarriage of justice will occur if the claim is not considered. *Coleman*, 501 U.S. at 750; *Galdamez v. Keane*, 394 F.3d 68, 73-74 (2d Cir. 2005).

Second, having fairly presented his or her federal constitutional claim to the appropriate state court and having been denied relief, the petitioner must appeal his or her conviction to the highest state court. *Klein*, 667 F.2d at 282. Where a petitioner fails to present his or her federal constitutional claim to the highest state court, the claim cannot be considered exhausted. *Id.* (citing *Williams v. Greco*, 442 F. Supp. 831, 833 (S.D.N.Y. 1977)). There is, however, another avenue available for exhaustion purposes. A petitioner who has failed to exhaust state remedies by pursuing a direct appeal may satisfy the exhaustion requirement by utilizing available state methods for collaterally attacking his or her state conviction. *See id.*; *see also Johnson v. Metz*, 609 F.2d 1052, 1055-56 (2d Cir. 1979) (instructing habeas petitioner who did not fairly present claim in the course of his direct appeals in New York state courts to proceed by filing a motion to vacate judgment pursuant to NYCPL § 440.10). If collateral relief is denied, the petitioner may satisfy the exhaustion requirement by employing the state appellate procedures available for review of such denial. *Klein*, 667 F.2d at 282-83. A petitioner "need not have invoked every possible avenue of state court review." *Keane*, 394 F.3d at 73. Instead, a petitioner must give the state courts "one full opportunity" to resolve any constitutional issues by invoking one complete round of the State's established appellate review process. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). A habeas petitioner who fails to meet a state's requirements to exhaust a

claim will be barred from asserting that claim in federal court unless he or she can demonstrate cause and prejudice or a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).

Even where a timely and exhausted habeas claim is raised, comity and federalism demand that a federal court abstain from its review when the last-reasoned state court opinion to address the claim relied upon an "adequate and independent finding of procedural default" to deny it. *Harris v. Reed*, 489 U.S. 255, 262 (1989); *see also Coleman*, 501 U.S. at 730; *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *Levine v. Comm'r of Corr. Servs.*, 44 F.3d 121, 126 (2d Cir. 1995). A state court decision will be "independent" when it "fairly appears" to rest primarily on state law. *Jimenez v. Walker*, 458 F.3d 130, 138 (2d Cir. 2006) (citing *Coleman*, 501 U.S. at 740)). A decision will be "adequate" if it is " 'firmly established and regularly followed' by the state in question." *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)).

Provided a claim meets all procedural requirements, the federal court must apply AEDPA's deferential standard of review when a state court has decided a claim on the merits. *See Torres v. Berbary*, 340 F.3d 63, 68 (2d Cir. 2003). Under AEDPA,

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established Supreme Court precedent "if 'the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.' " *Torres*, 340 F.3d at 68 (quoting *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)).

"[A]n unreasonable application of clearly established Supreme Court precedent occurs when a state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Torres*, 340 F.3d at 68 (internal quotation marks and citation omitted). The federal court must determine whether the state court's application of clearly established federal law was objectively unreasonable. *Id.* at 68-69 (citation omitted). In the Second Circuit, "the objectively unreasonable standard of § 2254(d)(1) means that the petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief." *Id.* (internal quotation marks and citations omitted).

## II.    Exhaustion

Petitioner's amended Petition presents several exhaustion issues which will be addressed herein prior to addressing the substance of the Petition. The first relates to whether the claims in the amended Petition which were raised in Petitioner's *pro se* brief to the Appellate Division were presented to the New York State Court of Appeals. The second relates to the reviewability of a new factual iteration of Petitioner's claim that counsel failed to establish an intoxication defense. The third relates to Petitioner's claim in the amended Petition that counsel failed to raise the defense of double jeopardy, which I had previously precluded with leave to renew if Petitioner could explain how this claim related back to his initial petition.

### i.    The Claims in Petitioner's *Pro Se* Appellate Brief

Respondent asserts that each of the claims in the Petition which mirror those previously raised in Petitioner's *pro se* supplemental appellate brief are unexhausted and procedurally defaulted, because Petitioner's leave application to the New York State Court of Appeals only referenced the claims in Petitioner's counseled appellate brief. ECF 17. This argument appears to rely on an omission in the state court record furnished by Respondent to this Court.

In conjunction with its response to Petitioner's initial habeas petition, Respondent submitted a state court record of exhibits, which included Petitioner's appellate counsel's June 13, 2013, leave letter to the New York State Court of Appeals. ECF 16, Ex. 3, p. 244. That leave letter concluded with the following request: "As [Petitioner] may be making a follow-up submission, please advise of the name of the Judge assigned to determine this matter, and the deadline for follow-up submissions." *Id.* The state court record also included the government's July 30, 2013, response in opposition, which specifically referenced "the claims raised in [Petitioner's] leave application *and supplemental papers...*." *Id.* ECF 16, Ex. 3, p. 242 (emphasis added).

The state court record furnished by Respondent to this Court did not include any supplemental letters or submissions from Petitioner to the New York State Court of Appeals. This omission was curious in light of the representations in Petitioner's counseled leave letter and the government's reference to "supplemental papers." Accordingly, the undersigned contacted the New York State Court of Appeals on May 23, 2017, and discovered that the New York State Court of Appeals, in considering Petitioner's leave application, requested that defense counsel submit copies of Petitioner's *pro se* supplemental brief and the government's supplemental response to the New York State Court of Appeals. Pursuant to that request, on June 26, 2013,

appellate counsel submitted a letter to the New York State Court of Appeals, which enclosed "copies of [Petitioner's] *pro se* brief, and the People's brief submitted in response to that brief." ECF 39, Ex. 1. The letter noted that a copy of the letter was sent to the Orange County District Attorney's Office. This supplemental letter adequately presented the claims in Petitioner's *pro se* brief to the New York State Court of Appeals. *See Galdamez v. Keane,* 394 F.3d 68, 77-78 (2d Cir. 2005) (a petitioner's submission of his appellate brief to the New York State Court of Appeals, without more, exhausted the claims in the brief for purposes of federal habeas review).

In light of this procedural history, Respondent's argument that the claims raised in Petitioner's *pro se* supplemental brief are unexhausted because they were not identified in Petitioner's leave application to the New York State Court of Appeals is erroneous and misleading. Therefore, I reject Respondent's exhaustion argument with respect to the claims raised in Petitioner's *pro se* supplemental brief.

### ii. The Intoxication Defense

In Petitioner's *pro se* supplemental brief to the Appellate Division, Petitioner asserted that counsel "never took time to establish the theory of his defense of '[i]ntoxication' when he intentionally, and knowingly, never sought to call any witnesses that can substantiate [Petitioner's] claims of intoxication...." ECF 16, Ex. 3, p. 200. Petitioner specifically asserted that "the one witness that was willing to attest to my consumption on (*sic*) alcohol, drugs during my abscense (*sic*) before the alleged events occurred on March 11, 2005, it would have played a major roll had counsel allowed or sought out [Jackson's] testimony as to [Petitioner's] state and/or mind-rrame (*sic*) before [the] incident of which he stands convicted." *Id.* The Appellate Division rejected this claim on the merits, finding that Petitioner was "not deprived of the effective assistance of counsel." *Kirksey,* 107 A.D.3d at 826. In his initial habeas petition,

Petitioner asserted that "counsel was ineffective and his deficiency deprived petitioner of a fair trial when counsel failed to present evidence that would substantiate the strategic defense he had outlined to the jury[.]" ECF 1. Petitioner did not elaborate on the nature of the evidence he believed counsel could have presented, did not identify the nature of this "strategic defense," and did not explicitly argue that counsel was ineffective in failing to raise an intoxication defense. In Petitioner's motion to stay his initial habeas petition, Petitioner stated, in part, that he had "failed to exhaust his significant claim of intoxication under the ground of Ineffective Assistance of Trial counsel," and intended to raise that claim by way of a NYCPL § 440.10 motion. ECF 8. Petitioner noted that this claim was "based on the testimony of the Complainant/victim, and the arresting officer...." *Id.* I construed Petitioner's stay application as a motion to amend his habeas petition, and liberally construed the proposed intoxication claim in the application as relating back to the "strategic defense" claim he had raised in his initial petition. ECF 14, p. 7. On that basis, I granted Petitioner's "request to amend his petition to include the claim of ineffective assistance of counsel based on counsel's failure to establish an intoxication defense." *Id.* I denied, however, Petitioner's application for a stay of the petition on the ground that the proposed claim was, "in essence, the same claim as the claim regarding counsel's failure to establish an intoxication defense raised on direct appeal," and, therefore, the claim was fully exhausted. *Id.* at p. 8.

In his amended Petition, filed on April 8, 2015, Petitioner reasserts the general claim from his initial petition that counsel failed to present evidence which would "substantiate the strategic defense he had outlined to the jury." ECF 18. As stated, I had previously construed that argument as raising the claim from Petitioner's *pro se* appellate brief that counsel failed to establish an intoxication defense – which was Petitioner's main defense at trial. Confusingly, in

a separate point heading, Petitioner further asserts that counsel failed to "establish an intoxication defense." *Id.* Additionally, in the "argument" section of his amended Petition, Petitioner, for the first time, specifically asserts that counsel was ineffective in failing to call an expert witness in support of Petitioner's intoxication defense. Petitioner argues that based on his testimony that he had imbibed "numerous 22 ounce bottles of Heineken and Colt 45 malt liquor" prior to the shooting, an expert could have concluded that petitioner had a blood alcohol content of .4% which, coupled with his marijuana and cocaine use, would have rendered Petitioner "mentally incapacitated." *Id.* Notwithstanding the highly confusing manner in which Petitioner has presented the above claims, I construe Petitioner's amended Petition as raising two distinct claims: (1) counsel was ineffective in failing to call lay witnesses and engage in effective advocacy in support of Petitioner's intoxication defense, and (2) counsel was ineffective in failing to call an expert witness who could have testified regarding Petitioner's level of intoxication and Petitioner's inability to form the requisite mental state to commit the crimes with which he was charged.

Petitioner's factual assertion that counsel failed to call an expert witness in support of his intoxication defense does not appear anywhere in Petitioner's state court filings, in Petitioner's initial habeas petition, or in Petitioner's motion to amend his petition. To the contrary, Petitioner's *pro se* brief to the Appellate Division specifically identified a lay witness as the witness Petitioner believed that counsel failed to call to "substantiate" Petitioner's intoxication defense, and Petitioner's motion to amend his initial habeas petition specifically noted that the claim was "based on the testimony of the Complainant/victim, and the arresting officer[.]" ECF 11. Although Petitioner's claim in his amended Petition that counsel failed to call an expert witness in support of his intoxication defense could be interpreted as being subsumed within his

general argument that counsel failed to establish an intoxication defense, Petitioner's specific factual allegation that counsel failed to call an expert witness "fundamentally alter[s] the legal claim already considered by the state courts." *Bonilla v. Portuondo,* No. 00 Civ. 2369 (JGK)(JCF), 2004 WL 350694, at *4 (S.D.N.Y. Feb. 26, 2004) ("As long as a habeas corpus petitioner presents factual allegations that do not 'fundamentally alter the legal claim already considered by the state courts' he [or she] has satisfied exhaustion requirements") (quoting *Vasquez v. Hillery,* 474 U.S. 254, 260 (1986)). Put differently, based on the manner in which Petitioner presented the claim in state court, I cannot conclude that the state court reached this particular iteration of Petitioner's claim. Indeed, at no point prior to the filing of the amended Petition did this Court, which is fully familiar with the factual and legal history of Petitioner's case, and which carefully reviewed the state court record, his initial petition, and the stay application, construe Petitioner's claim as having anything to do with an expert witness. Under these circumstances, to assume that the Appellate Division interpreted Petitioner's claim to include a claim relating to an expert witness would be unreasonable. Accordingly, Petitioner did not fairly present this claim in state court and the claim is unexhausted, rendering the instant Petition a mixed petition.

A federal district court may not rule on a "mixed petition" containing exhausted and unexhausted claims; in such cases, a district court should dismiss the petition without prejudice and give state courts the opportunity to rule on the unexhausted claims. *See Rose v. Lundy,* 455 U.S. 509, 518-19 (1982). However, because the AEDPA one-year statute of limitations can prevent a petitioner from returning to federal court for review of any of his or her claims, district courts may stay mixed habeas petitions and hold them in abeyance while the petitioner returns to state court to exhaust unexhausted claims. *Rhines v. Weber,* 544 U.S. 269, 275-76 (2005). A

stay of a mixed petition "should be available only in limited circumstances." *Id.* at 277. Specifically, a stay is "only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court." *Id.* Additionally, "even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him [or her] a stay when his [or her] unexhausted claims are plainly meritless." *Id.*

Here, Petitioner has failed to offer any explanation for why his claim that counsel failed to call an expert witness with respect to Petitioner's intoxication defense remains unexhausted. Indeed, despite raising a related claim in his *pro se* appellate brief, and thereby demonstrating his ability to independently raise claims in state court, Petitioner has not explained his failure to specifically assert in state court that counsel failed to call an expert witness in support of his intoxication defense. Accordingly, Petitioner has failed to show good cause for his failure to exhaust this claim and I decline to stay the amended Petition to permit Petitioner to exhaust this claim in state court.

Dismissal of the entire amended Petition, however, would "unreasonably impair the petitioner's right to obtain federal relief" because, if Petitioner were to re-raise the remainder of his instant claims in a subsequent Petition, they would be denied as untimely under AEDPA. *Rhines,* 544 U.S. at 278. Therefore, Petitioner "would have to either delete his unexhausted claims and have his other claims reviewed by the Court, or the entire petition would have to be dismissed and [Petitioner] would have no federal review of his claims." *Johnson v. Kirkpatrick,* No. 11 Civ. 1089 (CM)(AJP), 2011 WL 3328643, at *14 (S.D.N.Y. Aug. 2, 2011). I assume that Petitioner "would prefer his unexhausted claims deleted and other claims reviewed, and the Court proceeds as such." *Id.* (citing *Reyes v. Morrissey,* 07 Civ. 2539, 2010 WL 2034531, at *9 (S.D.N.Y. Apr. 21, 2010) ("On the assumption that Petitioner would prefer the Court to consider

the majority of his claims, rather than dismiss the entire Petition outright and risk being barred from raising any of those claims again in federal court, this Court will proceed to consider the remainder of the claims") (fn. omitted), *report and recommendation adopted* 2010 WL 2034527 (S.D.N.Y. May 19, 2010); *accord e.g., Taylor v. Poole,* No. 07 Civ. 6318(RJH)(GWG), 2009 WL 2634724, at *25 n. 11 ("The Court assumes that [petitioner] would prefer to have this [unexhausted and not stayed] claim omitted from his petition rather than having the entire petition dismissed")).

In any event, to the extent Your Honor concludes that Petitioner's overall claim in his *pro se* appellate brief that counsel failed to establish an intoxication defense exhausted his assertion that counsel failed to call an expert witness, and that the Appellate Division's determination that counsel provided effective assistance constitutes a merit based determination regarding Petitioner's expert witness claim, I conclude and respectfully recommend that Your Honor conclude, that the Appellate Division's determination was not contrary to or an unreasonable application of Supreme Court precedent.

In order to prevail on a claim of ineffective assistance under *Strickland v. Washington,* Petitioner must show that his counsel's representation was "fundamentally defective" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 669 (1984). Satisfying this burden is particularly difficult in the habeas context because "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 88 (2011). Both AEDPA and *Strickland* standards are "highly deferential," and "when the two apply in tandem, review is 'doubly' so." *Id.* at 105 (citations omitted). "The question is whether there is any reasonable argument that counsel satisfied *Strickland's*

deferential standard." *Id.* In order to justify relief, Petitioner must establish "that the state court's ruling... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

Here, there was an abundance of evidence presented at trial which supported the conclusion that Petitioner was capable of forming a specific intent at the time of the shootings. For instance, Sackett testified that during the argument preceding the shooting, Petitioner was speaking clearly and was not falling or stumbling. Further, Petitioner only retrieved the gun after Sackett told him that she was "fed up with him" and, following the shooting, Petitioner apologized to Sackett. ECF 17, Ex. 5, pp. 304-08. Prior to the shooting, a neighbor heard Petitioner say that if Petitioner could not have Sackett, then no one could. *Id.* at 276-83. Petitioner also fled the scene of the shooting, was able to reload his revolver prior to his encounter with Officer Eltz, and had the presence of mind to hide from the police in a window well. Additionally, when he was confronted by Eltz, Petitioner claimed that he had not done anything. ECF 17, Ex. 8, pp. 386-400. There was also testimony that when Petitioner was being transported to the police precinct, he said "I'm sorry. I fucked up. I did it because of love. I'm fucked up. I'm all fucked up. I ain't got nothing any more. Can I talk to the cop I shot? Can I please speak to the officer I shot the fires [*sic*] at. I want to say I'm sorry." ECF 17, Ex. 7, p. 441. Additionally, at the precinct, Petitioner admitted that when Sackett told him to leave he "went a little crazy" and "just snapped." During that interview, Petitioner's answers were logically responsive and the interviewing detective was able to understand Petitioner perfectly. ECF 17, Ex. 7, p. 554-91. Further, there was no medical evidence to support Petitioner's claim of intoxication on which an expert witness could have opined.

This evidence established that Petitioner was capable of forming a specific intent to shoot Sackett. Accordingly, there is no reasonable possibility that if Petitioner had presented an expert

witness at trial with respect to his intoxication that the result of the proceeding would have been different.

The Second Circuit's recent decision in *Waiters v. Lee,* 857 F.3d 466 (2d Cir. 2017), is instructive. In *Waiters*, the petitioner was convicted of murder and related charges for shooting and injuring his girlfriend, following an argument which was precipitated by the petitioner's girlfriend informing the petitioner that he had "too much to drink." *Id.* at 468. In the course of the shooting, the petitioner also shot and injured his girlfriend's 14-year old daughter, killed his girlfriend's aunt, and killed the aunt's three-year-old granddaughter. *Id.* At the petitioner's trial, the issue of whether the petitioner was too intoxicated to form a specific intent to commit the crimes with which he was charged was contested by the parties. In addition to various witnesses who testified regarding the petitioner's drinking of alcohol prior to the shooting, the defense introduced two pages of redacted medical records which established that the petitioner arrived at the hospital following the shooting in an intoxicated state. The trial court excluded the remainder of the medical records on the ground that they "would not be [relevant] without an explanation by medical personnel." *Id.* at 472-73.

In a post-judgment motion, the petitioner in *Waiters* asserted that counsel was ineffective in failing to call an expert witness to interpret his medical records and testify about his intoxication. *Id.* at 474. The state court held a hearing regarding this claim. At the hearing, an expert testified that the petitioner had a "significantly elevated" blood alcohol content of 0.39. *Id.* at 475. The expert also opined that because different individuals possess different levels of tolerance to alcohol consumption, he could not "opine on how tolerant [the petitioner] was, or on what effect his intoxication may have had on his ability to form intent." *Id.*

The state court rejected the petitioner's claim, in part, on the ground that expert evidence was not likely to have influenced the jury's result. *Id.* at 476. The District Court determined that the state court's rejection of the petitioner's claim was an unreasonable application of *Strickland* and granted the petitioner's habeas application. *Id.* at 477. The Second Circuit reversed and held that "the state court did not unreasonably apply *Strickland* in determining that [defense counsel's] conduct was not prejudicial, *i.e.*, in finding that [the petitioner] failed to demonstrate that it was reasonably likely that calling a medical expert would have changed the outcome of his trial." *Id.* at 479. The Second Circuit concluded that it was "not persuaded that, had the jury also heard from a medical expert and reviewed the full set of medical records, there is a sufficiently strong probability that it would have found differently such that the state trial court's determination to the contrary was unreasonable. While such evidence could have been proffered, it would not likely have made a difference in light of the strong, specific testimonial evidence indicating that Waiters formed the requisite intent to commit his crimes." *Id.* at 481. This evidence included an admission that the petitioner "targeted" one of the victims, attempted to flee the scene, obtained and hid his revolver, and aimed and fired the revolver. *Id.*

Here, the evidence of Petitioner's intoxication was even less susceptible to effective expert testimony than that in *Waiters*. There was no medical evidence of Petitioner's blood alcohol content on which an expert could have opined. Further, there was ample evidence in the record that Petitioner, like the petitioner in *Waiters,* "habitually abused alcohol" in the weeks preceding the incident, rendering it unlikely that an expert could have opined conclusively on the question of whether Petitioner's intoxication negated *his* ability to form a specific intent to commit the crimes at issue here. Moreover, like in *Waiters,* there was significant evidence of Petitioner's ability to form a specific intent. Accordingly, to the extent Your Honor determines that Petitioner

exhausted this claim, I conclude, and respectfully recommend that Your Honor should conclude, that the claim should be denied.[5]

### iii.    Double Jeopardy

In January of 2015, Petitioner sought a stay of his initial habeas petition to exhaust his claim that his judgment of conviction should be vacated on the grounds of double jeopardy, and that counsel was ineffective in failing to raise this claim. ECF 8, 11. In a Decision and Order dated March 13, 2015, I denied Petitioner's request on the ground that this claim was untimely and Petitioner had failed to explain how this proposed claim related back to the claims in his initial petition. ECF 14, p. 9. I offered Petitioner the opportunity to renew his motion to include this proposed claim, but required that Petitioner explain how this claim related back to his initial Petition. Petitioner's amended Petition simply raises his double-jeopardy claim without any explanation of how this claim relates back to Petitioner's initial petition. Indeed, Petitioner notes in his amended Petition that this claim is unexhausted. ECF 18. Accordingly, Petitioner's claim regarding double jeopardy is stricken from the amended Petition. In any event, Petitioner fails to explain, let alone establish, how his conviction ran afoul of double jeopardy principles.

## III.    Petitioner's Claims for Habeas Relief

### A.  The Intoxication Defense

In the previous section, I concluded that Petitioner's factual assertion that counsel failed to call an expert witness in support of his intoxication defense was unexhausted and declined to review the claim. I now turn to Petitioner's exhausted claim that counsel was generally

---

[5] Petitioner also asserts in his amended petition that counsel should have called an expert witness with respect to Petitioner's alleged hallucinations and "violent trembling." ECF 18, pp. 9-11. This claim is similarly unexhausted. Further, there was no evidence in the trial record that Petitioner experienced hallucinations or violent trembling and, in any event, Petitioner fails to articulate how either the alleged hallucinations and/or violent trembling effected Petitioner's ability to form a specific intent. Accordingly, this claim should also be denied.

ineffective in failing to establish an intoxication defense. ECF 18, p. 3. In rejecting this claim, the Appellate Division held that Petitioner was "not deprived of the effective assistance of counsel." *Kirksey,* 107 A.D.3d at 826. This determination was not contrary to or an unreasonable application of *Strickland.*

The evidence that Petitioner shot and injured Sackett, and that he shot at Officer Eltz, was strong; that evidence included a statement by Petitioner that prior to the shooting he was intoxicated and that he accidentally shot Sackett because he "snapped." EF 17, Ex. 8, pp. 586-88. From the very start of Petitioner's trial, counsel framed the incident as an "accidental shooting that took place because of voluntary intoxication, drugs, alcohol, marijuana"; a defense which was arguably consistent with Petitioner's statement to the police. ECF 17, Ex. 2, pp. 4-5. In his opening statement, counsel informed the jury that he would focus during the trial on the question of Petitioner's intent in light of his drinking prior to the incident. ECF 17, Ex. 4, pp. 235-36. In support of this defense, counsel cross-examined Sackett with respect to Petitioner's drinking prior to the incident and Petitioner's demeanor during the incident. ECF 17, Ex. 5, pp. 330-32. Further, counsel elicited testimony from Petitioner that he had consumed a large amount of alcohol over the course of the day on March 10, 2005, and that he drank so much that he had double vision and could not remember how he had gotten home. ECF 17, Ex. 8, pp. 638-39. Counsel further elicited that Petitioner did not review his statement to the police before signing it. *Id.* at 657. In his closing statement, counsel marshalled the evidence in support of the defense that Petitioner was too intoxicated to form a specific intent. Counsel argued that the detective who interrogated Petitioner minimized Petitioner's level of intoxication, that Sackett's testimony established that Petitioner had been drinking a lot prior to the incident, and that Petitioner's responses to Officer Eltz's and Officer Valeri's instructions were signs of Petitioner's

intoxication. ECF 17, Ex. 10, pp. 691-98. This record establishes that counsel actively and competently pursued an intoxication defense.

Petitioner faults counsel for failing to call witnesses who would have testified to Petitioner's level of intoxication. Specifically, in his *pro se* appellate brief, Petitioner argued that counsel should have "sought out [Jackson's] testimony as to [Petitioner's] state and/or mind-rrame (*sic*) before [the] incident of which he stands convicted ...." ECF 16, Ex. 3, pp. 200-01. The record, however, suggests that counsel wanted to call Jackson but was unable to. At the start of Petitioner's trial, counsel informed the court that he had two potential eyewitnesses, Gary Jackson, who was present during Petitioner's drinking before the incident, and Jackson's girlfriend. *Id. at* 12-13. Counsel noted, however, that Jackson "refused to cooperate" and that he did not know the last name of Jackson's girlfriend. *Id.* At the close of Petitioner's case, counsel informed the court that "[w]e had some discussion yesterday with regard to another witness, which we will not be calling, and there is no reason to believe that [the prosecutor] would ask for a missing witness charge." ECF 17, Ex. 8, p. 624. Accordingly, the record suggests that Jackson was not willing to testify and Petitioner fails to identify any other way – other than his assertion that counsel should have called an expert witness – that counsel could have more effectively pursued an intoxication defense. Therefore, I conclude, and respectfully recommend that Your Honor conclude, that Petitioner's claim that counsel failed to establish an intoxication defense should be denied.[6]

Relatedly, Petitioner's claim that "counsel's ineffectiveness rose to the level of a complete denial of counsel," could be liberally interpreted to raise the general assertions of ineffective assistance of counsel from Petitioner's *pro se* appellate brief. However, the state court's

---

[6] Notably, the trial court instructed the jury with respect to intoxication in its final charge. ECF 17, Ex. 11, p. 791.

determination that Petitioner had received the effective assistance of counsel was not contrary to or an unreasonable application of *Strickland.* Petitioner asserted in his *pro se* appellate brief that counsel failed to grasp the seriousness of Petitioner's crime, lacked familiarity with the case, failed to properly examine Petitioner and other witnesses, and failed to investigate the case. ECF 16, Ex. 3, p. 195-207. A close review of the trial record, however, reveals that counsel was fully familiar with the facts of Petitioner's case, offered cogent opening and closing argument, made appropriate objections, and competently cross-examined the government's witnesses. To the extent that counsel's examinations of witnesses appeared constrained at times, such constraint appears to have been the result of the strong evidence of Petitioner's guilt, rather than any deficiency on the part of counsel. Accordingly, I conclude, and respectfully recommend that Your Honor should conclude, that Petitioner's various assertions of ineffective assistance of counsel should be denied.

### B. Severance of the Incident Involving Sackett from the Incident Involving Eltz

Petitioner asserts that the "assault counts relative to officer Eltz and Connie Sackett should have been separated [sic] for purpose of trial." ECF 18, p. This claim was first raised in Petitioner's counseled appellate brief. ECF 16, Ex. 2, p. 104. Petitioner argued that the court erred and abused its discretion in "not splitting the trials between events related to the attack on Officer Eltz, and those related to the attack on Connie Sacket[]" and, thereby, deprived Petitioner "of a fair trial, the right to present a defense, due process of law and equal protection of the law." *Id.* In support of this argument, Petitioner argued that it was not realistically possible for the jury to avoid "comingling" the crimes and "homogenizing" the evidence during deliberations. *Id.* at 106 (quoting *People v. Harris,* 51 A.D.2d 937 (1st Dept. 1976)). In rejecting this claim, the Appellate Division held as follows:

> The Supreme Court properly denied the defendant's motion to sever certain counts in the indictment, since the nature of the proof for each of the offenses was material and admissible as evidence upon the trial of the other counts in the indictment (*see* CPL 200.20 [2] [b]). Inasmuch as the offenses were properly joined in one indictment from the outset, the court lacked the statutory authority to sever them.

*Kirksey*, 107 A.d.3d at 825. This holding addressed the statutory element of Petitioner's argument under state law but did not address Petitioner's claim that the trial court's determination with respect to his severance motion deprived him of a fair trial, equal protection, and due process. Accordingly, I will review review the constitutional dimension of Petitioner's claim *de novo*. *See Aparicio v. Artuz*, 269 F.3d 78, 93 (2d Cir. 2001) ("The necessary predicate to [deferential AEDPA review] is, of course, that petitioner's federal claim has been 'adjudicated on the merits' by the state court. If a state court has not adjudicated the claim 'on the merits,' we apply the pre-AEDPA standards, and review *de novo* the state court disposition of the petitioner's federal constitutional claims") (citing *Washington v. Schriver*, 255 F.3d 45, 55 (2d Cir. 2001)).[7]

"[J]oinder of offenses has long been recognized as a constitutionally acceptable accommodation of the defendant's right to a fair trial" and therefore, to succeed on a claim of due process based on joinder, a petitioner "must go beyond the potential for prejudice and prove that

---

[7] Respondent asserts that this claim is unexhausted because Petitioner "moved for severance solely as a matter of the trial court's discretion" and Petitioner's appellate brief "never claimed or otherwise demonstrated that denial of severance in his case resulted in a denial of due process." ECF 17, p. 20. Petitioner's motion for severance, however, specifically argued that failure to sever the two incidents would deny Petitioner "his constitutional right to a fair trial." ECF 16, Ex. 1, p. 61. Similarly, the first point heading in Petitioner's appellate brief raised three distinct claims of error – including Petitioner's severance claim – and then asserted that "[t]hese errors deprived [Petitioner] of a fair trial, the right to present a defense, due process of law and equal protection of law." ECF 1, Ex. 2, p. 104. The first paragraph following that point heading explicitly referenced the assertion in Petitioner's severance motion that failing to sever the two incidents would deny Petitioner "his constitutional right to a fair trial." ECF 16, Ex. 2. Petitioner's explicit references to the deprivation of a constitutional right to a fair trial and due process fairly presented his constitutional claim to the state court.

*actual* prejudice resulted from the events as they unfolded during the trial." *Herring v. Meachum,* 11 F.3d 374, 377-78 (2d Cir. 1993) (alteration in original); *United States v. Lane,* 474 U.S. 438, 449 (1986).[8] "[P]etitioners challenging their state convictions under the general 'fairness' mandate of the due process clause bear an onerous burden." *Id.* at 378.

Here, the trial court instructed the jury that:

> These crimes are joined in a single indictment solely for the convenience of the Court. Ordinarily the fact that a defendant is charged with one crime constitutes no proof that he committed another crime also charged in the same indictment. Therefore, unless the Court specifically instructs you otherwise, you are required to separate in your mind the evidence applicable solely to each crime and return a verdict on each crime based solely on the evidence applicable to that particular crime.

ECF 17, Ex. 11, p. 789. The jury is presumed to have followed this instruction "unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant." *Herring,* 11 F.3d at 378 (citations and internal quotation marks omitted).

There is no overwhelming probability that the jury was unable to follow the trial court's instruction. The presentation of evidence was straightforward and lasted only three days. Many of the key facts were largely uncontested. The incident involving Sackett and the incident involving Eltz were related but geographically and factually distinct such that a jury could distinguish between the two incidents and process the evidence with respect to each incident separately. Lastly, presentation of evidence with respect to the incident involving Officer Eltz, without reference to the preceding incident involving Sackett, would have made little practical

---

[8] "As a preliminary matter, it should be stressed that the issue for this Court is not whether the consolidation... in this case was proper under state law." *McCall v. Artus,* No. 06 Civ. 3365, 2008 WL 4501834, at *8 (S.D.N.Y. Sept. 29, 2008) (citing *Estelle v. McGuire,* 502 U.S. 62, 67 (1991)). Pure errors of state law are not cognizable on habeas review.

sense. Indeed, the prosecution's theory of the case was that Petitioner's shooting at Officer Eltz was precipitated by the incident involving Sackett. Separating the two incidents, therefore, would have seriously undermined the prosecution's ability to establish Petitioner's motive and may have been confusing to the jury. In sum, in light of the nature of the evidence, the manner in which that evidence was presented to the jury, and the trial court's clear instructions, Petitioner has failed to meet his onerous burden of showing that he was actually prejudiced by the consolidation of these two incidents in one trial. Therefore, I conclude, and respectfully recommend that Your Honor conclude, that this claim should be denied.

### C. Sackett's Letters to Petitioner

Petitioner asserts that he was deprived of his rights under the Fourteenth Amendment when the trial court precluded him from utilizing letters that Sackett wrote to Petitioner following the incident. ECF 18. Petitioner first raised this claim in his counseled appellate brief, in which he argued that the court's decision to preclude these letters deprived Petitioner of the right to present a defense and of his right to a fair trial. ECF 16, Ex. 2, p. 109. In rejecting Petitioner's claim, the Appellate Division held that Petitioner's "remaining contentions…are without merit." *Kirksey,* 107 A.D.3d at 826.[9] This determination was not contrary to or an unreasonable application of Supreme Court precedent.

_____

[9] Since the Appellate Division did not directly address this claim in its decision, the Appellate Division's reference to the "remaining contentions" in Petitioner's brief included Petitioner's instant claim. *See Ellis v. Miller,* No. 97 Civ. 7049 (JG), 1998 WL 812664, at *fn. 5 (E.D.N.Y. Aug. 3, 1998) ("The Appellate Division did not address this claim directly, and therefore it was included among petitioner's 'remaining' claims that were not preserved for appellate review"); *Grant v. Ricks,* No. 00 Civ. 6861 (JBW), 2003 WL 21847238 (E.D.N.Y. July 29, 2003) (finding claims procedurally barred where Appellate Division held that "the defendant's remaining contentions… are unpreserved for appellate review […], and, in any event, without merit").

Prior to the start of trial, Petitioner's counsel informed the trial court that he intended to introduce two letters at trial which were written by Sackett to Petitioner in July of 2005, and December of 2008, respectively. ECF 17, Ex. 4, pp. 183-86. According to Petitioner's counsel, the letters included the following relevant statements: (1) "I know it was never your intention to hurt me," (2) "I know you didn't want to hurt me this way," and (3) "Wish you had slowed down on the drinking. When you drank you turned into somebody else." *Id.* Counsel later clarified that he intended to ask Sackett "if she had contacted, by letter, [Petitioner] post-incident, after March 11, 2005, and did she, in fact, tell him that she knew that he didn't mean what he did. And the other one that was more specific did you say that you knew it was not his intention to hurt you." *Id.* at 220. Counsel argued that these letters were probative of Petitioner's intent and that these letters corroborated Petitioner's defense. *Id.* The trial court precluded the letters on the ground that Sackett's opinion as to what Petitioner intended was irrelevant. *Id.* at 221-24.

Under both state and federal law, "[o]ut-of-court statements which are offered for the truth of their content constitute hearsay, and may not be admitted unless they come within an exception to the hearsay rule." *People v. Slaughter,* 189 A.D.2d 157, 159 (1st Dept.) *lv. denied* 81 N.Y.2d 1080 (1993); FRCP 801, 803. Based on this rule, New York courts have held that an expression by a declarant of another person's intent is inadmissible. *See People v. Peralta,* 261 A.D.2d 101, 102 (1st Dept. 1999) ("The proffered evidence was essentially an expression by the declarant of her expectation as to what another person intended to do, and thus it was properly excluded"); *People v. Rowe,* 172 A.D.2d 701, 702 (2d Dept. 1991) ("We also find that the trial court properly precluded the defense counsel from eliciting the defendant's psychiatric expert's opinion as to whether the defendant was capable of forming the intent to kill on the date of the crime. Whether the defendant intended to kill the victim was a question solely within the

province of the jury"); *People v. Smith*, 289 A.D.2d 960, 961 (4th Dept. 2001) ("Were we to reach the merits of that contention, we would conclude that the testimony of the second witness was not admissible. Contrary to the People's contention, the victim's statement to that witness was not a statement of intent to perform a future act and thus does not fall within the state of mind exception to the hearsay rule").

Here, defense counsel sought to elicit that Sackett wrote two letters – out of court statements – following the incident on March 11, 2005, in which she stated that Petitioner had not intended to shoot her. Counsel sought to elicit this information to support the theory of the defense that Petitioner did not intend to shoot Sackett – the truth of the matter asserted in the letters. There is no exception to the hearsay rule, under either state or federal law, which, under these circumstances, would permit counsel to elicit Sackett's post-incident opinion of Petitioner's intent at the time of the shooting. Accordingly, I conclude, and respectfully recommend that Your Honor conclude, that the state court's preclusion of this evidence was not contrary to or an unreasonable application of Supreme Court precedent.

### D. Prior Uncharged Crimes

Petitioner asserts that the trial court erred in permitting the prosecution to introduce evidence of an altercation between Petitioner and Sackett which took place approximately one month before the shooting. ECF 18. The Appellate Division rejected this claim on the ground that it was unpreserved for appellate review. *Kirksey*, 107 A.D.3d at 826. "The Second Circuit has determined that [New York's preservation rule] is an independent and adequate state procedural ground" ordinarily barring habeas review. *Read v. Superintendent Mr. Thompson*, No. 13 Civ. 6962 (KMK)(PED), 2016 WL 165716, at *10 (S.D.N.Y. Jan. 13, 2016) (quoting *Moore v. Conway*, No. 08-CY-6390, 2010 WL 4117411, at *7 (W.D.N.Y. Oct. 20, 2010), *aff'd*,

476 F. App'x 928 (2d Cir. 2012)); *see also Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011)

("[The Second Circuit] ha[s] held repeatedly that the contemporaneous objection rule is a firmly

established and regularly followed New York procedural rule."). Petitioner has failed to allege,

let alone establish, cause for this default and prejudice arising therefrom, or that failure to review

this claim will result in a fundamental miscarriage of Justice. Accordingly, I conclude, and

respectfully recommend that Your Honor conclude, that this claim should be denied.

Petitioner also asserts, as he did in his *pro se* supplemental appellate brief, that counsel

was ineffective for failing to preserve this claim for appeal. ECF 18. This claim necessarily fails

because the Appellate Division held, in the alternative, that "any error [regarding the introduction

of evidence of prior uncharged crimes or bad acts] was harmless, as there was overwhelming

evidence of the defendant's guilt, and no significant probability that the error affected the

verdict." *Kirksey,* 107 A.D.3d at 826. To the extent that the Appellate Division denied

Petitioner's claim on the merits in the alternative, Petitioner cannot establish that if counsel had

preserved this claim for appeal, the result of the appeal would have been different. Therefore,

Petitioner cannot establish prejudice under *Strickland.* Accordingly, I conclude, and respectfully

recommend that Your Honor conclude, that this claim should be denied.

### E.  Legal Sufficiency and Weight of the Evidence

Petitioner asserts that the evidence adduced at his trial was legally insufficient and that

his conviction was against the weight of the evidence. ECF 18. In rejecting this claim on direct

appeal, the Appellate Division found as follows:

> The defendant's contention that the evidence was legally insufficient
> to establish his guilt is unpreserved for appellate review. In any
> event, viewing the evidence in the light most favorable to the
> prosecution, we find that it was legally sufficient to establish the
> defendant's guilt beyond a reasonable doubt. Moreover, upon our

> independent review pursuant to, we are satisfied that the verdict was
> not against the weight of the evidence.

*Kirksey,* 107 A.D.3d at 826. Petitioner's weight of the evidence claim is not cognizable on

habeas review because it does not assert a federal claim. *See Douglas v. Portuondo*, 232

F.Supp.2d 106, 116 (S.D.N.Y. 2002) (quotation marks and citations omitted); *see also Garbez v.

Greiner*, 01 Civ. 9865 (LAK)(GWG), 2002 WL 1760960, at *8 (S.D.N.Y. July 30, 2002).

Petitioner's legal sufficiency claim is not reviewable because the Appellate Division's

determination that the claim was unpreserved constitutes an independent and adequate bar to

habeas review. Accordingly, I concludes, and respectfully recommend that Your Honor

conclude, that these claims should be denied.

### F. Prison Garb

Petitioner asserts that he was forced to wear prison garb during trial. ECF 18. Petitioner

raised this claim in his *pro se* supplemental brief. ECF 16, Ex. 3, p. 200. In rejecting this claim,

the Appellate Division held that Petitioner's "remaining contentions, including those raised in his

pro se supplemental brief, are without merit." *Kirksey,* 107 A.D.3d at 826.

Here, the trial record suggests that Petitioner was wearing prison-issued clothing during

portions of his trial. Indeed, when asked to identify Petitioner in court, Sackett identified him by

his "green jumper." ECF 17, Ex. 5, p. 297. Other witnesses identify Petitioner as wearing a

green shirt at various points throughout the trial and over the course of several days. ECF 17,

Ex. 5, pp. 267, 278, 289, 344; Ex. 6, pp. 380, 393, 404; Ex. 7, pp. 438, 529. Although the record

does not explicitly state that the "jumper" was prison-issued, this inference is reasonable on the

present record. Nevertheless, at no point did counsel object to Petitioner wearing prison-issued

clothing during the trial. "[A]lthough the State cannot, consistently with the Fourteenth

Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison

clothes, the failure to make an objection to the court as to being tried in such clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation." *Dixon v. McGinnis,* No. 06 Civ. 39 (RJS)(FM), 2010 WL 3260459, at *14 (S.D.N.Y. June 9, 2010) (citing *Estelle v. Williams,* 425 U.S. 501, 512–513 (1976)), report and recommendation adopted 2012 WL 6621728. Accordingly, I conclude, and respectfully recommend that Your Honor conclude, that Petitioner's claim should be denied.

### G. Recusal

Petitioner asserts that he was denied his "sixth amendment right to a fair trial" by the trial judge's failure to recuse himself after exhibiting bias toward Petitioner. ECF 18. In rejecting this claim on direct appeal, the Appellate Division held that Petitioner's "remaining contentions, including those raised in his pro se supplemental brief, are without merit." *Kirksey,* 107 A.D.3d at 826. This determinations was not contrary to or an unreasonable application of Supreme Court precedent.

On June 8, 2009, Petitioner moved to disqualify Judge Nicholas DeRosa from presiding over his trial. ECF 16, Ex. 1, p. 27. Petitioner had previously pled guilty in this case and was sentenced by Judge DeRosa. *Id.* Although the conviction was later vacated and Petitioner proceeded to trial, Petitioner asserted that Judge DeRosa had made comments at his prior sentencing which were favorable to the police and which established that Judge DeRosa was friends with police officers. *Id.* Petitioner quoted the following paragraph from his sentencing in support of his argument:

> For every crime there is a police officer really close somewhere, many times right at the scene of the crime itself. A dangerous job. I went to a party this weekend for the son of a friend of mine, friends of mine, I should say, who graduated from the police academy and starts his first day today with the New York City Police Department in the Bronx. Can you imagine what they thought when they picked

up the Times Herald Record this morning and saw the headlines,
two police officers shot in New York City by a deranged man. This
is their son's first day on the job. And he's with the New York City
Police Department. Look, there is no excuse for anything that
happened here.

ECF 16, Ex. 1, pp. 40-41.

"[M]ost matters relating to judicial disqualification [do] not rise to a constitutional level."

*FTC v. Cement Inst.,* 333 U.S. 683, 702 (1948). "To prevail on a claim of judicial bias,

[P]etitioner must demonstrate that he did not receive a trial 'by an unbiased and impartial judge

without a direct personal interest in the outcome of the hearing.' " *Barbur v. Superintendent of*

*Wende Correctional Facility,* No. 05 Civ. 709, 2010 WL 1816696, at *5 (W.D.N.Y. May 5,

2010) (citing *Ungar v. Sarafite,* 376 U.S. 575, 584 (1964)). "Mere allegations of judicial bias or

prejudice do not state a due process violation." *Brown v. Doe,* 2 F.3d 1236, 1248 (2d Cir. 1993),

*cert. denied,* 510 U.S. 1125 (1994). Indeed, "only in the most extreme cases would

disqualification [on the basis of bias or prejudice] be constitutionally required." *Aetna Life Ins.*

*Co. V. Lavoie,* 475 U.S. 813, 821 (1986). "The Supreme Court has held that a judge's opinion

about a case, which results from his involvement in previous proceedings involving the same

parties, is not a 'basis for a bias or partiality motion unless [the opinion] display[s] a deep-seated

favoritism or antagonism that would make fair judgment impossible.' " *Whitefield v. Bennett,*

No. 01 Civ. 914 (VEB), 2007 WL 3232499, at *10 (W.D.N.Y. Oct. 31, 2007) (citing *Liteky v.*

*U.S.,* 510 U.S. 540, 555 (1994)).

Here, at Petitioner's sentencing, Judge DeRosa noted that it benefitted the criminal justice

systems when victims spoke at sentencing proceedings and when police officers offered pre-

sentencing comments to the probation department. In that context, Judge DeRosa briefly

observed that police officers have a dangerous job and that the son of one of his friend's was

about to begin his first day as a New York City police officer. He also noted that there was no excuse for Petitioner's actions. These comments do not establish that Judge DeRosa had a personal interest in the outcome of the case or that he held a "deep-seated favoritism or antagonism which would make fair judgment impossible." *Id.* Moreover, I have carefully reviewed the transcript of Petitioner's trial and conclude that Judge DeRosa's evidentiary and other rulings at Petitioner's trial do not evince any bias or favoritism. Accordingly, I conclude, and respectfully recommend that Your Honor conclude, that Petitioner's claim should be denied.

### H. Cumulative Errors

Petitioner asserts that the cumulative effect of the errors at his trial deprived him of a fair trial. ECF 18. Petitioner first raised this claim in his counseled appellate brief, in which he argued that "[t]he cumulative effect of the above errors deprived [Petitioner] of a fair trial and due process of law." ECF 16, Ex. 2, p. 122. The "above errors" to which this argument referred were those in Petitioner's counseled appellate brief. Namely, that (1) the trial court erred in not splitting the trials between the events related to Sacket and those related to Eltz, (2) the trial court erred in precluding Sacket's post-incident letters to Petitioner, (3) the trial court erred in permitting the prosecutor to introduce evidence of an altercation between Petitioner and Sacket which occurred approximately one month prior to the incident, (4) the evidence was legally insufficient and the verdict was against the weight of the evidence, (5) the assault convictions as to each victim should have been dismissed as inclusory concurrent counts of the attempted murder counts, and (6) Petitioner's sentence was excessive. In rejecting this claim, the Appellate Division held that Petitioner's "remaining contentions…are without merit. *Kirksey,* 107 A.D.3d at 826. This determination was not contrary to or an unreasonable application of Supreme Court precedent.

"Habeas relief may be justified based on the cumulative effect of errors that, standing alone, would not warrant the granting of a new trial." *Joyner v. Miller,* No. 01 Civ. 2157 (WHP) (DF), 2002 WL 1023141, at *13 (S.D.N.Y. Jan. 7, 2002) (citing *United States v. Lumpkin,* 192 F.3d 280, 290 (2d Cir.1999)). "But implicit in such a claim is, first, that the alleged individual errors a petitioner seeks to aggregate are actually *errors.*" *Id.* Moreover, in order to prevail on a cumulative error claim, the errors must be "so prejudicial that they rendered petitioner's trial[] fundamentally unfair." *Id.* (citation omitted). The Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States,* 493 U.S. 342, 352 (1990). "Merely aggregating rulings or events unfavorable to the defense is not sufficient to show a lack of fundamental fairness." *Ponder v. Conway,* 748 F. Supp. 2d 183, 197 (W.D.N.Y. 2010). Furthermore, the individual errors alleged by a petitioner must be subject to federal habeas review in order to be considered as part of a cumulative error analysis. *Collins v. Scully,* 878 F. Supp. 452, 460-61 (E.D.N.Y. 1995).

Here, Petitioner's claim that his sentence was excessive and should be reduced in the interest of justice is not cognizable on habeas review (*White v. Keane,* 969 F.2d 1381, 1383 (2d Cir. 1992)) and, in any event, does not constitute an "error" by the trial court. Further, as stated, Petitioner's claim that the trial court erred in permitting the introduction of evidence of an altercation between Petitioner and Sackett is procedurally barred. Similarly, Petitioner's claim that there was legally insufficient evidence is procedurally barred and his claim that his conviction was against the weight of the evidence is not cognizable on habeas review. Additionally, neither of these claims constitute an error by the trial court. I has also concluded that Petitioner's claim that the trial court erred in precluding Sackett's post-incident letters to Petitioner is procedurally barred and, in any event, without merit. Similarly, I have concluded

that Petitioner's claim that the court should not have joined the incidents relating to Sackett and those relating to Eltz in a single trial is without merit.

Petitioner's claim that the assault counts as to each victim should have been dismissed as inclusory counts of the attempted murder counts is not cognizable on federal habeas review because the federal nature of this claim was not presented to the state court. Indeed, although the point heading in Petitioner's counseled brief cursorily referenced the Fourteenth Amendment, Petitioner's argument was premised entirely on New York law, did not cite a single federal case, did not employ any federal constitutional analysis, and did not present a fact pattern which implicates the federal constitution. *See* ECF 16, Ex. 2, p. 37. The claim that a trial court should have dismissed an inclusory concurrent count is a "pure issue of New York State law" and is not cognizable on habeas review. *Crews v. Herbert,* 586 F. Supp. 2d 108, 118 (W.D.N.Y. 2008). Further, as Petitioner effectively conceded in his brief (ECF 16, Ex. 2, p. 119), assault in the first degree is not technically a lesser included offense of attempted murder. *Id.* Indeed, Petitioner impliedly acknowledged that the relief he sought might require an "expansion of the current caselaw." ECF 16, Ex. 2, p. 119. Accordingly, the individual claims which form the basis for Petitioner's cumulative error claim either are not cognizable on habeas review, and/or are without merit, and/or are not actual errors. Therefore, I conclude, and respectfully recommend that Your Honor conclude, that this claim should be denied.

## CONCLUSION

For the foregoing reasons, I conclude, and respectfully recommend that Your Honor should conclude, that the petition should be dismissed in its entirety. Since Petitioner's claims present no questions of substance for review, I conclude, and respectfully recommend, that a certificate of probable cause should not issue. *See Rodriguez v. Scully*, 905 F.2d 24 (2d Cir.

1990) (*per curiam*); *Alexander v. Harris*, 595 F.2d 87, 90-91 (2d Cir. 1979). I further conclude, and respectfully recommend, that the Court should certify pursuant to 28 U.S.C. § 1915(a) that an appeal from this order would not be taken in good faith. *See Coppedge v. United States*, 369 U.S. 438 (1962).

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(d), or a total of seventeen (17) days, *see* Fed. R. Civ. P. 6(a), from the date hereof, to file written objections to this Report and Recommendation. Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Nelson Román, at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered. Requests for extensions of time to file objections must be made to Judge Román.

A copy of this Report and Recommendation, as well as the unpublished opinions cited therein, have been mailed to Petitioner.

Dated: July 31, 2017
White Plains, NY

Respectfully submitted,

Lisa Margaret Smith
United States Magistrate Judge
Southern District of New York

42